Eastern District Court

Plaintiff: Terrance Prude.

-vs-

Case #23-CV-1233

Defendant: Candice Dixon.

## Plaintiff's Combined Brief In Response To Defendants Motion For Summary Judgment (Dkt. 40) And Reply To Defendants Response Brief (Dkt. #40)

There are clearly material facts in dispute that warrants **both parties** motion for summary judgment to be **denied** so that a jury can decide the material disputes. Berry v. Chicago Transit Authority, 618 F.3d 688, 691 (7th Cir. 2010). Admitting this is legally mandatory. See Goka v. Bobbitt, 862 F.2d 646, 650-51 (7th Cir. 1988).

## Purpose Of Filing A Civil Complaint

(1) The defendants attorney, Jonathon M. Davies, seems to be fundamentally confused about how civil lawsuits work starting from the civil complaint (Dkt.#1) & up through discovery and to summary judgment. I won't spend much time to highlight counsel's lack of wisdom

on civil actions and each of its stages.

(2) A civil complaint is not a summary judgment where a party must put forth all it's evidence to prove liability on the constitutional violations being alleged. Stated differently, filing a civil complaint is not the "put up or shut up" moment as stated by the Seventh Circuit Court of Appeals.[1] A plaintiff only needs to allege (without any supporting facts) the basic information as a bare minimum to show that the allegations support a plausible constitutional violation in order to move forward in the case to survive screening.[2] My civil complaint tactically chose to only provide enough information to survive screening. In fact, the complaint even gave notice (which was not required) that the 8th Amendment claim has "evidence" that Dixon was "actually complicit in my stabbing".[3] The evidence that came out during the discovery stage of the case delivered on that notice. This is how a civil case work where the defendant learns more

---

[1] Weaver v. Champion Petfoods USA Inc., 3 F.4th 927, 938 (7th Cir. 2021).
[2] Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009).
[3] See Dkt. #1, par 23.

about the evidence a plaintiff has to support the claims that survived screening.

(3) Dixon's attorney, Mr. Davies, spent 5-pages at least (see Dkt.#40, Pages 1-5) claiming "Prude's version of events has continually changed throughout this litigation" (see Dkt.#40, Page 1). Then, Mr. Davies argues that when I motioned to compel discovery I "also added - again for the first time - that Dixon had told him to send $2,000 to her Cash App account to avoid being stabbed;" (see Dkt.#40, Page 2-3). Then, Mr. Davies argues that: "At the deposition, Prude added yet more colorful details to his narrative" (see Dkt.#40, Page 3). In sum, defendants attorney's unusual complaint seem to believe that I should: (1) have gave all the details in my civil complaint instead of waiting to discovery and/or summary judgment to reveal these details; or (2) only confined my evidence to what little was said in my civil complaint.

(4) It's clear that defendants attorney is a novice to how these civil processes work. If the system worked how defendants attorney desired, a plaintiff would never be able to use more "colorful details" than what the bare minimum allegations asserted in their civil complaint. In fact, the Seventh Circuit Court

of Appeals has said that a plaintiff who pleads too much detail in the civil complaint runs the risk of pleading himself out of court.[4] It's weird that the State's Assistant Attorney General don't understand how these civil proceedings work.[5] My civil complaint gave all the details required under Federal Rule 8(a)(1)-(3). The other details properly came out during discovery.

## Argument

### Reply To Defendants Response To Prude's Motion For Summary Judgment (Dkt#40, Page 8, par A.)

(5) I agree with the defendant that her "material disputes" does not entitled me to summary judgment if this Court finds that her disputes are not so disbelievable that no reason jury would believe her version of the story. This case warrants a trial in the event this Court does not find her disputes as lacking credibility. Scott v. Harris, 550 U.S. 372, 380 (2007).

---

[4] McCready v. eBay, Inc., 453 F.3d 882, at 888 (7th Cir. 2006).
[5] For attorney Davies convenience, I'm mailing him a paper copy of a "Jailhouse Lawyer's Civil Procedure For Dummies" that is available to me from the prisons law library

## Prude's Response To Dixon's Motion For Summary Judgment (Dkt.#40, Page 8-9, par B.)

(6) Defendants, once again, misunderstands how deliberate indifference in failure to protect cases work. Defendants claim that because I did not take extra steps to avoid being stabbed I'm responsible for my injury, not Dixon. This defense is not legally available to defendants in this case because it is a defense that claims I was negligent and that such negligence was contributory to me being stabbed. The Seventh Circuit Court of Appeals has repeatedly rejected outright such defenses. See Gidarisingh v. Pollard, 571 Fed. Appx. 467, at 471 (7th Cir. 2014) ("Second, the district court wrote that Gidarisingh put himself at risk by "voluntarily" leaving his cell, which allowed Lewis to sneak up on him. But "contributory negligence is not a defense to an allegation of intentional or reckless conduct.").

(9) The standard is clearly explained in Gidarisingh v. Pollard, Id. at 470-71 ("Once prison officials know about a serious risk of harm, they have an obligation to take reasonable measures to abate it. But

as far as the record so far shows, Lesatz did not investigate the threat, delegate the matter to an underling, or deal first with more pressing issues. If prison officials are aware of a serious threat and do nothing, that is deliberate indifference. Had Lesatz taken some reasonable action in response to the threat, even if it did not ultimately prevent an attack, he might avoid liability." ) (internal quotations and case citations omitted).

(10) The defendant absurdly asserts that she "did not act with deliberate indifference because she alerted Prude to the threat, and Prude put himself in harm's way by failing to alert security." See Dkt #40, Page 9. The defendant clearly misunderstands that she is the one who had "an obligation to take reasonable measures to abate it". Gidarisingh v. Pollard, Id. at 470. Also, just see par 9 above. Defendant Dixon's choice to alert me was not reasonable and she should have alert security herself as a reasonable measure. In short, Dixon's defense is in effect this: "I told Prude of the threat to kill him and I had no further obligation to do anything more so I sat on the information about the threat to his safety and refused to tell anyone else". Clearly, this is a clear-cut case of deliberate indifference with this type of omission. Additionally, let's not forget "why"

defendant Dixon alerted me to the threat and "why" defendant Dixon did not alert any prison officials. See Prude's Proposed Findings Of Facts (Dkt.#28), at par 1-4, 6-10. In short, Dixon was the threat.

(11) Defendants cite Hunter v. Mueske, 73 F.4th 561 (7th Cir. 2023) for their position that my "failured to notify security staff of the threat to my safety" is the superseding and proximate cause of [my] injury." See Dkt.#40, Page 10-11. The case cited by defendants counsel is easily distinguished on the facts that led to the decision. The facts of Hunter v. Mueske boils down to the following core facts: (1) Hunter provoked the altercation by confronting his attacker; (2) Hunter's attacker was in the process of moving away from Hunter when Hunter confronted his attacker; (3) The defendant Mueske, could not predict that Hunter would voluntarily approach his attacker after begging to be kept separated from his attacker. The Court placed emphasis on "why" it was ruling the "way" it did by stating: "To be clear, we do not suggest that Hunter is to blame for his injuries, far from it. We hold **only** that his decision to approach Patterson, and his resulting injury, were not within the scope of the foreseeable risk created by Mueske's conduct." (emphasis

added). See Hunter v. Mueske, Id. at 569.

(12) The facts of my case is totally distinguishable from the facts of Hunter v. Mueske because of the following core facts: (1) Dixon was a co-actor in the threat by notifying me of the threat as a means of effectuating the extortion attempt[6]; (2) Dixon used her improper relationship[7] with inmates[8] as her weapon (i.e. the prisoners, at her direction, would attack me if I don't pay her); (3) I was set-up by Dixon and her co-actors to be placed in a position that would effectuate the attack and the injuries I suffered ("At this point it is unclear who completed the HSR form for TDP, but it's clear that he made no such request to be seen by HSU. This is evidence that someone other than Inmate TDP completed the HSR form and that it was a possible ploy to get him in a position to be assaulted.");[9] (4) Dixon did not tell

---

[6] Dkt#28, par 1-4.
[7] Exhibit#202, Page 2-3, 5-6; Dkt#28, par 1-4, 6-7.
[8] Dixon had an improper and unlawful relationship with at least four different inmates, two of which I was aware of (Dkt#28, par 2-4, 6-7, 19) and the other two I was not aware of (Exhibit#202, Page 2).
[9] See Dkt#1-1, P. 2 of JH, second paragraph

anyone about the risks to my safety"; (5) When I refused to pay Dixon an extortion fee she went and told her prison boyfriends that I refused to pay which triggered the assault". This conduct by Dixon was "within the scope of the foreseeable risk generated by [Dixon's] conduct". <u>Hunter v. Mueske</u>, Id. at 569. The facts of my case are distinguished from the facts that led to the decision of <u>Hunter</u>.

(13) The fact that I did not notify "other" prison officials (for reasons I still believe were legit[12]) only proves that "other" prison officials cannot be held to have been "aware" of the threat to my safety. The defendant Dixon is the only defendant being sued in this case[13]. My decision to not make "other" prison staff "aware" of the same risks to my safety that Dixon was "aware" of does not immunize Dixon, it

---

[10] <u>Dkt.#28, par 9-10.</u>
[11] <u>Dkt.#28, par 1-4, 6-7, 24.</u>
[12] <u>Dkt.#28, par 11.</u>
[13] <u>Dkt.#5 (Court dismissing John Kind from this case due to John Kind not being made "aware" of the same information Dixon was "aware" of). In effect, Dixon argues that because she (and I) failed to report the threat to supervisory staff...</u>

only immunizes the "other" prison staff who were not made aware.

(14) What's more shocking is that during my deposition, which was conducted by Dixon's attorney Jonathon M. Davies, it was suggested to me that I should have or could have went and got other inmates to help me physically defend against the threat made by Dixon and her prison boyfriends.[14] Mr. Davies then retreated from the suggestion when I questioned the lawfulness of advocating to me to go get other inmates to start a "war" against Dixon and her prison boyfriends.[15] This suggestion came from an employee of the Department Of "Justice". Had I actually died as a result of this assault these are the defenses my family would be ashed/subjected to suing on my behalf. This line of questioning support the very reason why I don't trust prison staff.[16]

---

[14] See Deposition Transcript (Dkt.#36), at "Page 96" Line 1 through to "Page 97" Line 18. (Page 26 of 51 of the Courts electronic page number).
[15] Dkt.#36, "Page 97" Line 1-20.
[16] Dkt.#36, "Page 77" Line 10-1 of "Page 78"; and "Page 79" Line 2 through "Page 82" Line 18.

(15) In a last ditch effort to compound more absurd arguments, Dixon's attorney erroneously claims that the facts of my case "is analogous to Faulkner v. Litscher, 130 F. App'x. 812, 813 (7th Cir. 2005)". See Dkt.#40, Page 2, at 2. The facts of Faulkner are, also, easily distinguishable from the facts of my case because of the following core facts: (1) Faulkner was offered to transfer to a different part of the prison by the defendant in a attempt to prevent the risk to his safety[17]; (2) Faulkner turned down the defendants reasonable attempts to abate the risk to his safety[18]. The prison staff who were aware of the risk to Faulkner's safety offered to separate him from the inmates who were a risk to his safety, but Dixon did not do anything to abate the threat to my safety because she was (along with her prison boyfriends) the threat to my safety. Id.

---

[17] Dixon never tried, nor did she offer, to provide a legal or reasonable means to abate the risk to my safety. In fact, the only means Dixon offered me to abate the threat to my safety was to pay her $2,000. See Dkt.#28, par 3-4.

[18] Dixon did not at all concern herself with my safety. Dixon placed a "hit" against me. See Dkt.#28, par 6-7.

(16) Dixon, through her attorney, seem to believe that because she notified me (and did nothing more to protect me from a threat that she was inherently aware of) somehow reversed ~~my~~ the obligation to me to protect myself. ~~[redacted]~~ See Dkt. #40, Page 13 ("Here, by Prude's own account, Dixon notified Prude of the threat against him. Dixon could reasonable infer that Prude would use this information to take some — any — preventative action. Prude "made a bad choice" by doing nothing, and his assertion of deliberate indifference does not save him from the consequences of his own inertia."). This is not the law. To refreshen minds reading this motion about what the law is and ~~[redacted]~~ says, I quote the Seventh Circuit Court of Appeals: "Under the Eighth Amendment, prison officials have a duty to protect prisoners from violence at the hands of other prisoners." See Gidarisingh v. Pollard, Id. at 470. Dixon was "subjectively aware" of the threat against me (because she and her prison boyfriends was the threat against me) and it was her "duty to protect [me] from violence at the hands of other prisoners". Id. 470.

(17) Dixon admits that the only thing she did was testify. See Dkt #40 P 15 (claiming the 8th

Amendment did not "require[] Dixon to do anything more than issue that warning."). Three sources tells us Dixon is wrong: (1) <u>Gidarisingh v. Pollard</u>, 571 Fed. Appx. 467, at 470-71 (7th Cir. 2014); (2) DAI Policy 300.00.71, I. A. 2. f., II. A. 1. - 2. See Dkt.#1, par 15 and see Dixon's Answer at Dkt.#14, par 15; and (3) John Kind's own Declaration at Dkt.#34, par 36 ("...staff are trained to report the threat to the security office."). Clearly, Dixon was required to take measures, herself, that were reasonably aimed at abating the threat. She did nothing whatsoever. This is deliberate indifference.

## The Proper Lens Under The Eighth Amendment When Prison Staff Actively Permit And Encourage Inmate-On-Inmate Assault As Co-Actor

(18) In <u>Pavlick v. Mifflin</u>, 90 F.3d 205 (7th Cir. 1996), the Seventh Circuit Court of Appeals explained the difference between "failure to protect cases" and cases where prison officials "actually participated in the assault against [inmate]". Id. at 210 ("Unlike Williams, Watts, and Richardson, this case is not merely one of a prison officer's alleged failure to protect an inmate. In

failure to protect cases, the debate often exclusively concerns what the prison official knew and when he knew it because it is important to insure that guards are not held liable for failing to prevent the unforeseeable acts of third parties. In such cases, a prisoner's lawsuit may turn on whether a guard heard certain rumors and thus knew that the inmate was in danger. Here, however, the focus is on what Mifflin did rather than on what he failed to do: he was observed conversing with the attackers and opening Pavlick's cell door immediately prior to the assault. As we have noted, these facts potentially show more than simple knowledge of or acquiescence to the attack; they could lead a reasonable jury to conclude that Mifflin actually participated in the assault against Pavlick. Thus, the rumors are not necessary to demonstrate that Mifflin possessed the requisite mental state; the jury was entitled to draw the inference from his actions alone."). Id.

(19) Dixon's conduct, like Mifflin's conduct, is based on the fact that she "actually participated in the assault". See Dkt.#28, par 1-4, 6-7, 24; and compare with Pavlick v. Mifflin, 90 F.3d 205, at 206-09 (7th Cir. 1996).

(20) Also, importantly, the Seventh Circuit Court of

Appeals expressly rejected the invitation to blame the inmate-Plaintiff Pavlick for his failure to inform other prison officials of the danger he was in. See Pavlick v. Mifflin, Id. at Footnote 7("Similarly, because knowledge may be inferred from Mifflin's actions, it does not affect our conclusion that Pavlick never informed Mifflin (or anyone else) that he was in danger — or even that Pavlick himself may not have known that he was in any danger (Pavlick may have been unaware that he was in danger because he did not hear the conversation between Spiller and Schoolcraft). See Farmer, 511 U.S. at ----, 114 S.Ct. at 1984("[T]he failure to give advance notice is not dispositive.... [A prisoner] may establish [the defendant's] awareness by reliance on any relevant evidence.")."). Just as Pavlick's failure to alert other prison officials was not relevant to that case, my failure to alert other prison officials is equally not relevant in this case. In my case, Dixon affirmatively announced her intentions not to protect me when she told me it would be my "funeral" (Dkt.#28, par 4) if I refused to pay her $2,000 (Dkt.#28, par 3). Dixon "issued an order of permission for inmates to abuse [Prude]...". See Snider v. Dylag, 188 F.3d 51, at 55 (2nd Cir. 1999). While being stabbed I was told it was because I refused to pay Dixon her extortion fee. See Dkt #28, par 6,7.

## Offender Separation Alerts (Dkt.#34-1 at Defendants Exhibit #1002)

(21) Dixon, through her attorney, intentionally seeks to mislead this Court into believing that the Offender Separation Alerts form it present to this Court is reflective of Keep Separate (or "SPN") requests that I filled out requesting to be kept separated from inmates. See Dkt.#34, par 12-13; Dkt.#34-1. This is a deliberate FALSEHOOD!! Each of the 12 different offender separations were NOT initiated by me and was, instead, initiated by either prison staff or by inmates. ~~[redacted]~~ I've NEVER submitted a SPN against staff or inmates my entire 25 years I've been in prison. Prude Declaration, at par 4.

(22) I was only aware of one prisoner (Leon Prileau) placing a SPN against me because of a altercation between he and I that took place in 2008. Prude's Declaration, at par 5. This document (Dkt#34-1, Exhibit #1002) is my first time being made aware that on eleven occasions eleven different inmates placed SPNs against me. Prude's Declaration, at

par 6.

(23) This document says nothing about "who" sought to be kept separated. See Dkt.#34-1. This omission by Dixon (through her attorney) was intentional for the purpose of trying to give the impression I, and I alone, repeatedly turned in a SPN request.[19] If I was the one who sought to be kept separated from any prisoner I would simply concede the point because such an admission would not affect or alter the fact Dixon is liable for the assault she authorized/ordered[20] against me. Prude's Declaration, at par 7___. In fact, even John Kind has provided at least one instance of when someone initiated a SPN against me. See Dkt.#34, par 39 ("An SPN was filed on Prude's behalf to keep Prude and Henderson separated by facility on October 12, 2023."). In fact, prior to Dixon (through her attorney) disclosing that someone (i.e. prison staff) filed an SPN against me to keep me separated from Henderson, I assumed Henderson

---

[19] I've been in prison for 24 years and 9 months so of course I have a general understanding of how prisoners can ask to be kept separated from other prisoners or staff.

[20] See Snider v. Dylag, 188 F.3d 51 (2d Cir. 1999)

himself was the person who did it, not prison officials. See Prude's Declaration, par 8____. Thus, I push back forcefully against John Kind's false testimony that I ever submitted a SPN against any of the 12 prisoners listed (Note: eleven of the prisoners names are blacked-out via redaction) on the Exhibit #1002 at Dkt. #34-1. Again, although the allegation would mean zero even if true, I felt the need to point out that it is a falsehood to claim I ever sought to be kept separated from any prisoner or staff.

## Dixon's Qualified Immunity Defense Is Without Merit

(24) Dixon oddly believes that because she told me about the threat by Henderson to stab me (which she approved when I refused her extortion attempt) that she's entitled to qualified immunity. Dkt. #40, Page 15. Hogwash. Dixon only told me about threat in hopes that it could be used as a extortion tool. See Dkt. #28, par 1-4. Dixon's qualified immunity defense cannot be taken as serious. This is a civil case where merely invoking the defense requires me to defeat it, Dixon did not genuinely believe such defense applies.

desperate attempt to avoid liability. Just as the defendant in <u>Pavlick v. Mifflin</u>, 90 F.3d 205 (7th Cir. 1996), <u>Snider v. Dylag</u>, 188 F.3d 51 (2nd Cir. 1999) were not entitled to qualified immunity neither is Dixon entitled to it. As such, the defendant Dixon is not entitled to qualified immunity.[21]

## Conclusion

(25) The defendants motion requesting summary judgment and qualified immunity must be denied under the facts of this case. A trial is necessary, See <u>Berry v. Chicago Transit Authority</u>, 618 F.3d 688, 691 (7th Cir. 2010), and admitting that there exist genuine issues of material fact precluding summary judgment for me and defendant Dixon is not just something I should admit but is something I legally must admit when material facts are genuinely disputed.[22]

Terrance Prude / Terrance Prude / Date: 8/18/2024

---

[21] I'm currently in the process of filing a John Doe criminal proceeding against Dixon (under <u>Wis. Stat. 968.26</u>) for these actions she engaged in against me when she held "public office" as a prison official.

[22] See <u>Pavlick v. Mifflin</u>, 90 F.3d (4th) 1 (50-51 (7th Cir. 1988)